JEFFERSON COUNTY SCHOOL
DISTRICT R–1, Petitioner,

v.

Christine GILBERT, a minor, by her parents and next friends, James GILBERT and Mary Ann Gilbert and James Gilbert and Mary Ann Gilbert individually, Respondents.

Christine GILBERT, a minor, by her parents and next friends, James GILBERT and Mary Ann Gilbert and James Gilbert and Mary Ann Gilbert individually, Petitioners,

v.

The CITY OF ARVADA, a municipal corporation, Respondent.

Nos. 84SC327, 84SC335.

Supreme Court of Colorado,
En Banc.

Sept. 8, 1986.

Wood, Ris & Hames, P.C., F. Michael Ludwig, Clifton J. Latiolais, Jr., Denver, for petitioner Jefferson County School Dist. R–1.

Richard L. Whitworth, Wheat Ridge, for Gilberts.

Greengard & Senter, Thomas S. Rice, Denver, for City of Arvada.

ROVIRA, Justice.

This case is a review of the court of appeals opinion in *Gilbert v. City of Arvada*, 694 P.2d 847 (Colo.App.1984), which dealt with negligence claims stemming from an automobile-pedestrian accident.

Shortly before noon on February 14, 1978, Christine Gilbert, a five-year-old kin-

dergartner at Lawrence Elementary School in Arvada, Colorado, was injured while walking home from school with a classmate on Grandview Avenue. As the children crossed Carr Street at its intersection with Grandview, about five blocks from the school, Gilbert was struck by a car driven by Roy Miller.

The intersection in question is controlled by stop signs which stop traffic on Carr street and allow traffic on Grandview to flow unimpeded. Visibility at the intersection is clear and unobstructed in all directions. While Grandview forms a straight east-west line at this point, the northern and southern portions of Carr Street at the Grandview intersection are offset by approximately 13 feet, requiring vehicles traveling on Carr to steer slightly to the right as they cross the intersection in order to stay in the driving lane. Miller, who was traveling north on Carr, stopped at the stop sign on the south side of Grandview. He struck Gilbert in the northern cross-walk after proceeding across Grandview.

Gilbert and her parents brought an action alleging negligence against Miller, the Jefferson County School District R–1 (the school district) and the City of Arvada (the city). They contended that the city was negligent in designing, constructing, and maintaining the intersection and that the school district was negligent in failing to post crossing guards during the late-morning time period in which kindergartners walked home. Both the school district and the city moved for summary judgment. The school district argued that it was entitled to summary judgment on the grounds that it had no duty to provide crossing guards or other safety measures at an intersection more than five blocks from the school. The city contended that summary judgment should be granted in its favor on the grounds that the intersection was not unsafe, and submitted a supporting affidavit by Ronald Hensen, a professional engineer, stating that the intersection and all the crosswalks were designed and maintained in accordance with "nationally recognized engineering standards."

In opposition to these motions, the Gilberts contended that the school district assumed a duty to post crossing guards at the intersection and that the stop signs provided by the city did not provide adequate traffic control due to the offset nature of the intersection. In support of their argument, James Gilbert, Christine Gilbert's father, submitted an affidavit stating that there were crossing guards at the intersection "during portions of 1978, but only for children walking home in the afternoon...." Robert Caldwell, a professional engineer, submitted an affidavit stating that the intersection was "confusing and dangerous to kindergarten-age children" and that use of a crossing guard or installation of a push-button traffic signal could have prevented this "confusing and dangerous situation." Caldwell's affidavit did not challenge Hensen's statement that the intersection conformed with "nationally recognized engineering standards."

After hearings on the motions, the trial court granted summary judgment in favor of both the school district and the city. The case against defendant Miller then proceeded to trial, where a verdict of negligence was returned against Miller. Miller did not appeal.

The Gilberts appealed both of the district court's summary judgment orders. They argued that by placing crossing guards at the intersection at other times, the school district had assumed a duty to provide crossing guards during the times when kindergartners walked home. They also contended that Caldwell's statement that the intersection was "confusing and dangerous" and could have been made safer through installation of a signal raised a genuine issue of fact sufficient to preclude summary judgment in favor of the city.

In a divided opinion the court of appeals reversed the grant of summary judgment for the school district, holding on the basis of *Justus v. Jefferson County School District R–1,* 683 P.2d 805 (Colo.App.1984), *rev'd,* 725 P.2d 767 (Colo.1986), that the existence of crossing guards at other times

raised a genuine issue as to whether the district had assumed a duty to provide crossing guards at the time Gilbert was injured. *Gilbert v. City of Arvada,* 694 P.2d 847, 848–49 (Colo.App.1984). The court also unanimously affirmed the grant of summary judgment for the city, stating that, "there was nothing to support [the Gilberts'] allegations that the city negligently designed, constructed, or maintained the intersection." *Id.* at 848. It also noted, "That more could have been done, such as push-button stop lights, is irrelevant when what was done conformed to the standards." *Id.*

Both the district and Gilbert petitioned this court for certiorari review. We granted certiorari on the school district's petition in No. 84SC327 and the Gilberts' petition against the city in No. 84SC335. We now reverse the court of appeals in No. 84SC327 and reinstate summary judgment in favor of the school district. We affirm the grant of summary judgment for the city in No. 84SC335.

## I.

In No. 84SC327, the school district contends that the court of appeals erred in reversing summary judgment against the Gilberts on their assumption of duty claim. The court of appeals relied on its decision in *Justus,* 683 P.2d at 807, which held that the Jefferson County School District assumed a duty to prevent a six-year-old first-grader from leaving school on a bicycle. We granted certiorari in *Justus* and, in an opinion announced today, affirmed in part and reversed in part the court of appeals. *See Jefferson County School District v. Justus,* 725 P.2d 767 (Colo.1986). In that opinion we adopted the standard for assumption of duty set forth in the Restatement (2d) of Torts § 323 (1965), and discussed the application of that section to negligence actions in Colorado. We held that, in order to recover under an assumed duty theory,

A plaintiff must first show that the defendant, either through its affirmative acts or through a promise to act, under-took to render a service that was reasonably calculated to prevent the type of harm that befell the plaintiff. Second, a plaintiff must also show either that he relied on the defendant to perform the service or that defendant's undertaking increased plaintiff's risk.

*Jefferson County School Dist. v. Justus,* at 771 (citations and footnote omitted). In discussing the plaintiff's burden in making the first of these showings, we noted that:

[T]he scope of any assumed duty ... must be limited to the performance with due care of that service undertaken, because the school district's liability under a voluntarily assumed duty can obviously be no greater than the undertaking actually assumed.

*Jefferson County School Dist. v. Justus,* at 772 n. 5.

■ Even in the light most favorable to the Gilberts, the standard under which we must evaluate a motion for summary judgment, *see Jones v. Dressel,* 623 P.2d 370 (Colo.1981); C.R.C.P. 56(c), the affidavit of James Gilbert is simply insufficient to make the necessary showing that the school district undertook the task of placing crossing guards at the intersection during the times that kindergartners walked home. Here, the Gilberts have shown nothing more than that crossing guards were present at the intersection of Grandview and Carr "during portions of 1978, but *only* for children walking home in the afternoon" (emphasis added). Even if the school district undertook the task of placing crossing guards at the intersection during the afternoon, it does not follow that it also assumed a duty to do so in the morning. *See Jefferson County School Dist. v. Justus,* at 772 n. 5, *see also Ainey v. Rialto Amusement Co.,* 135 Wash. 56, 236 P. 801, 802 (1925) (undertaking to remove snow on front sidewalk did not constitute assumption of duty to remove snow from sidewalk in side alley); *Gilbert,* 694 P.2d at 849–50 (Van Cise, J., dissenting) ("Having the guards present when several times as many children are released in the afternoon

does not make it negligent not to provide guards when a single grade is dismissed in the morning."). The trial court therefore correctly granted summary judgment in favor of the school district.

The judgment of the court of appeals is reversed in 84SC327, and the case is remanded for reinstatement of summary judgment in favor of the Jefferson County School District.

## II.

In No. 84SC335, the Gilberts contend that the court of appeals erred in affirming the trial court's grant of summary judgment for the city. They argue that the Hensen affidavit filed by the city with its motion for summary judgment contained unsubstantiated and conclusory statements which were insufficient to support the court's grant of summary judgment. They also argue that summary judgment was inappropriate because Caldwell's affidavit raised a genuine issue of fact as to whether the intersection of Grandview and Carr was negligently designed. We disagree.

In *Wheeler v. County of Eagle*, 666 P.2d 559, 561 (Colo.1983), we held that a county had a "duty to maintain the roadway in a reasonably safe manner for members of the public who use it." Obviously, that duty is also applicable to cities. *See Stephen v. City and County of Denver*, 659 P.2d 666 (Colo.1983).

The court declined in *Wheeler* to address the scope of that duty in reference to trimming plant growth at the edge of a county road on the grounds that failure to exercise reasonable care under the circumstances was a factual issue that should have been left for the jury. 666 P.2d at 561. The legislature, however, has delineated the scope of the duty to design a roadway in a reasonably safe manner in reference to the placement of traffic signs and signals. *See* §§ 42-4-501, -503(1), 17 C.R.S. (1984); *cf. Dare v. Sobule*, 674 P.2d 960, 963 (Colo. 1984) (duty may derive from legislative enactment of the standard of conduct or judi-

cially imposed standard). Section 42-4-501, 17 C.R.S. (1984), requires adoption by the state department of highways of "a manual and specifications for a uniform system of traffic control devices" and authorizes adoption of the United States Department of Transportation's *Manual on Uniform Traffic Control Devices for Streets and Highways* (the Manual), along with a supplement setting forth the exceptions, additions, and adaptations to the Manual that are applicable in Colorado, as a means of compliance with this requirement. Section 42-4-503(1) adds:

> Local authorities in their respective jurisdictions shall place and maintain such traffic control devices upon highways under their jurisdiction as they may deem necessary to indicate and to carry out the provisions of this article or local traffic ordinances or to regulate, warn, or guide traffic.... *All such traffic control devices shall conform to the state manual and specifications for statewide uniformity as provided in section 42-4-501.*

§ 42-4-503(1), 17 C.R.S. (1984) (emphasis added).

Pursuant to section 42-4-501, the state department of highways adopted the 1971 edition of the Manual, Fed. Highway Admin., U.S. Dep't of Transp., *Manual on Uniform Traffic Control Devices for Streets and Highways* (1971 ed.) (1971 Manual), and its own 1975 supplement to the 1971 Manual, Div. of Highways, Colo. Dep't of Highways, *Colorado Supplement to Manual on Uniform Traffic Control Devices for Streets and Highways* (1975 ed.) (1975 Colorado Supp.). *See* Colo. Highway Comm'n, Res. No. 241-D (Nov. 26, 1975), *reprinted in* 1975 Colorado Supplement at ii. Although now superseded by a 1978 Manual and 1983 Colorado Supplement to that 1978 Manual, both the 1971 Manual and the 1975 Colorado Supplement were in effect on February 14, 1978 when the accident in question took place.[1]

---

1. The state highway commission first adopted the 1971 Manual and a Preliminary Colorado

Supplement in October 1971. *See* Colo. Highway Comm'n, Res. dated Oct. 9, 1971, *reprinted*

The Manual contains the following pertinent provisions with regard to traffic controls for school areas:

### 7A–1 Need for Standards

Traffic control in school areas is a highly sensitive subject. If all the demands of parents and others were met, there would have to be many more police and adult guards for school duty; and many more traffic signals, signs, and markings. Such demands, however, are not always in line with actual needs.

Analyses often show that at many locations, school crossing controls requested by parents, teachers and other citizens are unnecessary and costly and tend to lessen the respect for controls that are warranted. It is therefore important to stress the point that regardless of the school location, *safe and effective traffic control can best be obtained through the uniform application of realistic policies, practices and standards developed through engineering studies.*

. . . .

### 7A–6 Engineering Study Required

*The decision to use a particular device at a particular location should be made on the basis of an engineering study of the location. . . .*

1971 Manual at §§ 7A–1, 7A–6 (emphasis added); *see also* 1978 Manual at §§ 7A–1, 7A–6 (identical language).

In this light, it becomes clear that the statement contained in Hensen's affidavit that "The intersection and all the crosswalks were designed and maintained in accordance with nationally recognized engineering standards" is not, as plaintiffs suggest, vague and conclusory. Rather, the affidavit apparently refers to exactly those standards which define the scope of the city's duty to provide safe traffic control under section 42–4–503(1) and the Manual. Hensen's affidavit that the city complied with the standards that delineate the scope of its duty is therefore sufficient to support the trial court's grant of summary judgment.

Since the evidence presented in Hensen's affidavit is sufficient to support the grant of summary judgment, we must address the remaining question of whether Caldwell's affidavit raised a sufficient factual question to preclude summary judgment. We believe that it did not.

The city's duty to make its streets safe by placing appropriate signs and/or signals is effectively defined by the Manual as the exercise of sound engineering judgment. *See* 1971 Manual at §§ 1A–3, 7A–6; *see also* 1978 Manual at §§ 1A–4, 7A–6 (identical language). The question to be addressed here is therefore not whether the intersection was unreasonably designed or unsafe from the viewpoint of a lay juror, but rather whether the traffic control devices installed at the intersection conformed with sound engineering judgment as required by the Manual. *See Smith v. State,* 75 A.D.2d 910, 427 N.Y.S.2d 317, 319 (N.Y.App.Div.1980) (city could not be held liable for negligent planning of intersection where traffic control devices conformed to state manual and were installed after rational study by experts); *Legg v. City of New Orleans,* 219 So.2d 798, 800–01 (La. App.1969) (duty to design traffic control devices with reasonable care met when discharged in accordance with generally accepted engineering standards).

The 1975 Colorado Supplement states:

---

*in* Colo. Dep't of Highways, *Colorado (Preliminary) Supplement to Manual on Uniform Traffic Control Devices for Streets and Highways* at ii (1971). On November 26, 1975, the commission readopted the 1971 Manual along with the permanent 1975 Colorado Supplement. *See* 1975 Colorado Supplement at ii. Although the Federal Highway Administration promulgated a new Manual in 1978, Fed. Highway Admin., U.S. Dep't of Transp., *Manual on Uniform Traffic Control Devices for Streets and Highways* (1978 ed.) (1978 Manual), Colorado did not adopt the new Manual and the department of highway's new Colorado Supplement to that Manual until September 16, 1983. *See* Colo. Highway Comm'n, Res. No. 1362–D (Sept. 16, 1983), *reprinted in* Div. of Highways, Colo. Dep't of Highways, *Colorado Supplement to Manual on Uniform Traffic Control Devices for Streets and Highways* at ii (1983 ed.) (1983 Colorado Supp.).

Traffic control signals *shall* not be installed unless one or more of the signal warrants in the [1971] Manual are met. Existing signals shall be reevaluated whenever traffic conditions have changed considerably to determine whether or not the signals can still be justified. Unwarranted signals shall be removed....

1975 Colorado Supplement at § 4C–2 (emphasis in original); *see also* 1978 Manual at § 4C–2 (similar language). According to the Manual, there are only eight situations that warrant installation of a traffic signal:

Warrant 1—Minimum vehicular volume.

Warrant 2—Interruption of continuous traffic.

Warrant 3—Minimum pedestrian volume.

Warrant 4—School crossings.

Warrant 5—Progressive movement.

Warrant 6—Accident experience.

Warrant 7—Systems.

Warrant 8—Combination of Warrants.

1971 Manual at § 4C–2; *see also* 1978 Manual at § 4C–2 (identical language). With the exception of accident experience, which is based on the number and type of accidents occurring within a 12–month period, 1971 Manual at § 4C–8; (*see also* 1978 Manual at § 4C–8, each of these warrants, including the warrant for school crossings), is based on an analysis of either traffic or pedestrian volume and flow at and/or near the subject intersection. *See* 1971 Manual at §§ 4C–3 to –10, 7A–3; *see also* 1978 Manual at §§ 4C–3 to –10, 7A–3. The Manual sets forth specific volume, flow, or prior accident levels under each of the warrants. *Id.*

The record on appeal contains no evidence that traffic flow, traffic volume, or accident history at the intersection of Grandview and Carr would justify installation of a traffic signal under any of the warrants contained in the Manual. Nor did Gilbert allege that the city failed to gather the data or perform the requisite engineering analysis prior to making the determination that stop signs met the safety requirements for controlling the intersection. Rather, Caldwell's affidavit states only that the intersection was "confusing and dangerous to kindergarten-age children" and suggested a method by which safety could have been increased.

 The assertion that the intersection was dangerous but could have been made safer is simply insufficient to support an inference that the intersection was negligently designed. In order to recover in negligence, the Gilberts must show more than that increased care was technically feasible. They must also establish that the city exercised less than reasonable care. *E.g., Metropolitan Gas Repair Service, Inc. v. Kulik,* 621 P.2d 313, 318 (Colo.1980). Every intersection, no matter how well controlled, presents some danger to pedestrians. Short of placing elevated pedestrian walkways over each and every intersection, a task beyond the financial resources of any municipality, there is no way to completely eliminate this danger. *See Mayor and City Council of Cumberland v. Turney,* 177 Md. 297, 9 A.2d 561, 566 (1939) (negligence may not be inferred from mere fact that road or street is dangerous, since "absolute safety cannot be attained except at a prohibitive or impracticable cost"). Because perfect safety is not realistically attainable, local governments are required to achieve only a reasonable level of safety in conformance with section 42–4–503(1) and the national engineering standards set forth in the Manual. *See Smith v. State,* 427 N.Y.S.2d at 319; *Legg v. City of New Orleans,* 219 So.2d at 800–01. Summary judgment was therefore appropriate since the Gilberts presented no evidence to controvert Hansen's testimony that those reasonable safety standards were met.

Summary judgment having been properly entered in favor of the city, we affirm the judgment of the court of appeals in No. 84SC335.

QUINN, C.J., dissents in part, and DUBOFSKY, J., joins in the dissent in No. 84SC335.

DUBOFSKY, J., dissents in No. 84SC327.

LOHR, J., does not participate.

QUINN, Chief Justice, dissenting in part:

I respectfully dissent from Part II of the court's opinion. While I agree that our decision in *Jefferson County School District R–1 v. Justus*, 725 P.2d 767 (Colo.1986), supports the trial court's grant of summary judgment in favor of the school district, I dissent from the majority's determination that summary judgment was properly entered in favor of the City of Arvada on the Gilberts' negligence claim.

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Although summary judgment serves the salutary goal of saving judicial resources that might otherwise be expended in protracted litigation, it is not a substitute for a trial. *E.g., Mount Emmons Mining Co. v. Town of Crested Butte*, 690 P.2d 231, 239 (Colo. 1984). This court's affirmance of the summary judgment in favor of the city is predicated, in my view, on the erroneous premise that compliance with the standards set forth in the traffic control manual, adopted by the state department of highways pursuant to section 42–4–501, 17 C.R.S. (1984), constituted conclusive evidence of due care by the city. When this premise is rejected, as it should be, it is obvious that, notwithstanding the city's compliance with the manual, the plaintiffs presented evidence which raised a question of fact as to the city's failure to use reasonable care in designing the intersection and placing adequate traffic control signals at the intersection.

The majority turns its decision on section 42–4–501 which requires the state department of highways to adopt "a manual and specifications for a uniform system of traffic control devices" based essentially on "the most recent edition of the '*Manual on Uniform Traffic Control Devices for Streets and Highways*' and other related standards issued or endorsed by the federal highway administrator." The court holds that this statutory mandate defines the scope of the city's tort duty with respect to the design of, and the placement of traffic control signals at, the intersection. Contrary to the majority, I would hold that the City of Arvada's compliance with the manual is merely one factor to be considered in determining whether the city was negligent under the particular circumstances of this case.

It is an accepted principle of tort law that compliance with a statute or an administrative regulation promulgated pursuant to a statute is not conclusive evidence of due care unless the statutory scheme specifically states that compliance is to serve as the standard for tort liability. *See, e.g., Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), on remand, 769 F.2d 1451 (10th Cir.1985); *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579 (Colo.1984); *Maryland Heights Leasing v. Mallinkrodt*, 706 S.W.2d 218 (Mo.App.1985); *Stone v. Sterling Drug, Inc.*, 111 App.Div.2d 1017, 490 N.Y.S.2d 468 (1985); W. Prosser & W. Keeton, *The Law of Torts* § 36 at 233 (1984). Compliance with a statute or administrative regulation, in other words, constitutes some evidence of due care, but does not preclude a finding of negligence where a reasonable person would have taken additional precautions. *E.g., Blueflame Gas, Inc.*, 679 P.2d at 591; *Restatement (Second) of Torts* § 288C (1965). Nothing in section 42–4–501 suggests that compliance with the state department of highways' manual is the outer limit of a city's tort responsibility to design and maintain roadways in a reasonably safe manner for members of the public, including school children of tender years. Thus, while evidence of compliance with the manual would certainly be some evidence of the exercise of due care by the City of Arvada, nothing in section 42–4–501 prohibits a finding of negligence based on the city's failure to take additional precautions.

In this case the Gilberts raised factual questions sufficient to withstand the City of Arvada's motion for summary judgment. In opposition to the motion for summary judgment, the Gilberts filed the affidavit of Robert J. Cantwell, a licensed professional

engineer specializing in accident reconstruction and highway safety. Cantwell's affidavit stated that he examined the intersection at Carr Street and Grandview Avenue and that, in his opinion, it was confusing and dangerous for kindergarten-age children who were walking in the crosswalk across Carr Street. His affidavit also stated that the confusing and dangerous condition could have been alleviated by the installation of a standard traffic signal light with a pedestrian push-button control device. Since section 42–4–501 did not preclude a finding of negligence based on a city's failure to take additional precautions over and above those set forth in the state department of highway's manual, Cantwell's affidavit required the trial court to deny the city's motion for summary judgment.

I would therefore reverse the judgment entered in favor of the city and remand the case for trial.

I am authorized to say that Justice DUBOFSKY joins me in this dissent.

DUBOFSKY, Justice, dissenting:

I disagree with the majority's conclusion that summary judgment for Jefferson County School District (school district) was proper because the school district had not assumed the duty to place crossing guards at the intersection in the morning. The question whether the school district had a duty to provide crossing guards at the intersection for kindergartners returning home before noon is ultimately a question of law. *Metropolitan Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313 (Colo.1981). *See also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the*

*Law of Torts* ch. 6 § 37 at 236 (5th ed. 1984). However, resolution of the legal question depends largely on the foreseeability of the harm. *Metropolitan Gas,* 621 P.2d at 317. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Torts, supra,* Ch. 7 § 45 at 320.[1]

The district court in this case found that school crossing guards were used at the intersection during the afternoon dismissal but were not used during the morning dismissal of kindergartners. By placing crossing guards at the intersection during the afternoon, the school district recognized that injury to children crossing the intersection was foreseeable. Injury to kindergartners, who are younger and less experienced in crossing streets than older children, is even more foreseeable. At the least, the evidence concerning the use of crossing guards was sufficient to raise a genuine question of material fact concerning foreseeability, thus precluding summary judgment on the issue whether the school district had a duty to provide school crossing guards at the time Christine Gilbert was injured.[2] Therefore, I would affirm the part of the court of appeals' opinion reversing the district court's grant of summary judgment in favor of the school district.

I join in Chief Justice QUINN's dissent from section II of the majority opinion.

---

1. While the majority resolves this case on the assumption of duty or good samaritan doctrine, I believe there is no need to go beyond the customary considerations of duty and foreseeability to determine whether summary judgment was appropriate.

2. The foreseeability of harm is not the only factor to be considered in determining whether the school district owed a duty to provide crossing guards for children returning home from kindergarten in the morning. Other factors to

be weighed include the costs involved in imposing the duty, the likelihood of preventing future harm and the gravity of the possible harm. *See Turner v. Grier,* 43 Colo.App. 395, 397, 608 P.2d 356, 358 (1979); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Torts, supra,* ch. 7 § 43 at 298. In this case I think it unlikely that consideration of any of these factors would militate against the imposition of a duty on the school district if the factual question of foreseeability of harm was resolved against the district.