The BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF La PLATA, a political and governmental subdivision of the State of Colorado, Petitioner,

v.

Frederick MORELAND, Respondent.

No. 86SC181.

Supreme Court of Colorado,
En Banc.

Nov. 28, 1988.

Hall & Evans, Richard A. Waltz, Alan Epstein, Denver, for petitioner.

Alan E. Johnson, Durango, for respondent.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., John Milton Hutchins, Asst. Atty. Gen., Denver, for amicus curiae State of Colorado.

Scott H. Robinson, Gerald P. McDermott, Denver, for amicus curiae Colorado Trial Lawyers Assn.

LOHR, Justice.

■ The respondent, Frederick Moreland, became a paraplegic as a result of a fall from an unenclosed deck of a cabin located near Durango. He brought suit in negligence against the County of La Plata (County)[1] based upon the failure of the

---

1. § 30–11–105, 12A C.R.S. (1986), requires that "[i]n all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be, 'The board of county commissioners of the county of...'" The defendant in this case was styled as "The board of county

County to require that a guardrail be constructed around the deck, as mandated by the County's building code. A jury trial was held, after which the trial court entered judgment on a verdict in favor of Moreland. The County appealed to the Colorado Court of Appeals, which affirmed the judgment. *Moreland v. Bd. of County Comm'rs,* 725 P.2d 1 (Colo.App.1985). We granted certiorari to determine whether the County owed a duty to Moreland to assure that the deck was protected by a guardrail. We conclude that even if the building code imposed an obligation on the County to require the guardrail, Moreland has no civil liability remedy for damages resulting from the breach of such obligation because of the absence of a clear expression of legislative intent to create such a remedy. Accordingly, we reverse the judgment of the court of appeals.

## I.

Ron McEwan purchased a lot in the Aspen Trails subdivision in La Plata County in 1969 or 1970. In the spring of 1973, he began construction of the cabin that is at the center of the present controversy. By the fall of 1973 McEwan had excavated and put reinforcing rods in place for the foundation piers before ceasing work on the project until the spring of 1974.

Prior to the time McEwan began to build the cabin, the only regulation affecting residential construction in unincorporated La Plata County was resolution 1972–25, adopted by the board of county commissioners (board) on July 31, 1972, which required that a building permit be obtained from the county assessor's office prior to construction of any building. Resolution 1972–25 made no provision for submission of plans or specifications in applying for such a permit, and the resolution also was

silent concerning construction criteria, inspections and sanctions. The purpose of the building permit process was to place the improvements on the tax rolls and to gather information that would enable the assessor to value the improvements for assessment.

On December 31, 1973, the board enacted resolution 1973–130, which adopted the Uniform Building Code (U.B.C.) and provided that work with respect to any building could not be commenced or continued after January 1, 1974, in absence of compliance with that code. The adoption of such a code is specifically authorized by section 30–28–201(1), 12A C.R.S. (1986). The 1973 resolution, by its terms, superseded resolution 1972–25. The U.B.C. requires that before a building permit may be issued, a builder must submit a "plot plan" showing the location of the building on the property. The application must also include drawings showing the exterior appearance and the design features of the proposed structure. The building inspector is required to check the plans to ensure consistency with the basic U.B.C. requirements before issuing a building permit.

The U.B.C. also requires that the building inspector conduct a minimum of four inspections to assure code compliance in connection with construction of a single-family residence. These consist of a foundation inspection, a framing inspection, a plumbing, heating and electrical inspection, and a final inspection. In addition, the U.B.C. authorizes the building inspector to impose sanctions to remedy code violations constituting serious safety hazards. Among the pertinent U.B.C. requirements in effect when McEwan built his cabin was that all decks located thirty inches or more above ground be enclosed by a guardrail at least forty-two inches high.[2]

commissioners of the county of La Plata, a political and governmental subdivision of the State of Colorado."

**2.** The Uniform Building Code, § 1716 (1973), the code applicable to this case, provided in pertinent part:

All enclosed floor and roof openings; open and glazed sides of landings; balconies or porches which are more than 30 inches above

grade; and roofs used for other than service of the building shall be protected by a guardrail. Guardrails shall be not less than 42 inches in height. Open guardrails and stair railings shall have intermediate rails or an ornamental pattern such that no object 9 inches in diameter can pass through.

Despite the ostensible applicability of the U.B.C. to any construction conducted after January 1, 1974,[3] there was testimony to the effect that the board made a policy decision that the U.B.C. provisions regarding the issuance of building permits and the performance of building inspections would not apply to dwellings that were under construction prior to the adoption of the U.B.C. It can be inferred that this policy was based on inadequate staffing of the building department. Initially, the building inspector had no staff and worked out of his own home for about eighteen months. There was evidence that the workload created by the adoption of the U.B.C. was too great to permit complete and effective administration of the code requirements throughout La Plata County.

Richard Yeager, who served as the County's first building inspector from April 1974 to 1979, testified that he was instructed that he was not to inspect any building that had been started before he was hired. Butch Knowlton, who was hired as a building inspector during May 1976, testified that at the direction of the board he did not inspect buildings that were under construction before the U.B.C. was adopted. Paul Canatsey, the county engineer from January 1976 until the spring of 1979, testified that inspectors did not require permits or fees for any construction started before the adoption of the U.B.C. Canatsey testified that if a house was under construction at the time the resolution adopting the U.B.C. was enacted, it could be finished without a permit. According to Canatsey, however, if the County issued a permit after the enactment of the resolution, the County was obligated to monitor construction under the U.B.C. regardless of whether the construction began before or after the enactment of the resolution. Indeed, subsequent to January 1, 1974, there was no basis to issue a permit other than pursuant to the requirements of the U.B.C.; the prior resolution under which permits had been issued for the limited purpose of recording new construction on the assessor's tax rolls had been rescinded.

From the effective date of the U.B.C. on January 1, 1974, until late in the same year, the assessor, not the building inspector, issued all building permits. Notwithstanding the requirements of the U.B.C., the assessor, Clyde Demel, testified that he did not require the submission of plans before issuing a permit during this period. He did not consider construction matters to be within his responsibility. Until the building inspector took over the role of issuing building permits late in 1974, the assessor would issue the permits under the same procedures that he had followed prior to adoption of the U.B.C. and would then give the permits to the building inspector.

Prior to resuming construction in 1974, McEwan learned that he could not receive temporary electrical service necessary for construction activities [4] until he obtained a building permit. McEwan applied for such a permit, and the county assessor issued a building permit to McEwan on April 8, 1974. Consistent with his practice, the assessor did not require McEwan to submit building plans. The permit stated on its face that the owner agreed to comply with all pertinent laws and regulations in the location, construction and erection of the proposed structure.

The deck from which Moreland fell was built in 1974, and the construction of the residence continued into 1975. Although the deck had northern, southern and western exposures, only the western side was protected by a guardrail. The deck was as much as ten feet above the ground, and the U.B.C. specifications required a guardrail on all sides.

During trial, the parties disputed whether the County ever inspected the McEwan property, even though the evidence that inspections had taken place was meager.

---

**3.** § XIV of the resolution adopting the U.B.C. provided:

No person shall commence or *continue* any work in respect to any building ... in violation of the provisions of this Resolution. (Emphasis added.)

**4.** The inspection of buildings for compliance with electrical code requirements was a function of state inspectors, not of the county building inspector.

Building inspector Yeager testified that he did not inspect the property because his employers had instructed him not to inspect buildings under construction at the time the U.B.C. was adopted. He testified that he had inspected between ten and fifteen other buildings in the Aspen Trails subdivision and in the course of the inspections had driven by the McEwan residence and must have glanced at the deck. Yeager also testified that he was once at the McEwan residence while the construction was in progress to inquire about the services of a rock mason who was performing work on the McEwan property. McEwan testified that Yeager came to the house once in 1974 and once in 1975. McEwan related that during the 1974 visit Yeager spoke to a friend of McEwan who was putting up siding, but McEwan did not see Yeager write anything down. In 1975 Yeager was on the property for a few minutes and talked to a rock mason hired by McEwan. McEwan testified that Yeager was on the deck during both visits, and that although the western guardrail was probably in place in 1975, no guardrail existed during the 1974 visit. McEwan testified that he thought it was obvious that Yeager was inspecting the property in 1975. McEwan also testified that someone from the county assessor's office visited the property once.

In October of 1980, McEwan rented the cabin to Don Cole. On March 10, 1982, Moreland met Cole in Durango shortly after 5:00 p.m. They consumed some alcoholic beverages and then proceeded to Cole's cabin to continue their conversation.[5] After dark, Moreland walked onto the deck, thinking he would depart by way of the steps leading from the deck to the ground. He walked northerly along the western side of the deck with his hand upon the guardrail, and when the rail ended, he thought he had reached the top of the stairs. In fact, the stairs were located at a different corner of the deck. Moreland stepped downward, lost his balance, and fell ten feet into the rocks below. Moreland became paraplegic as a result of injuries sustained in the fall.

Moreland brought an action against the County, alleging, among other things, that the negligent acts and omissions of county employees caused his injuries. The case was tried as a typical negligence action. The jury was instructed that the negligence asserted by the plaintiff was the failure of the County to require or check plans for the cabin and the failure to inspect the construction, which omissions were among the reasons that a guardrail was not present to prevent Moreland's fall.[6] The County asserted that Moreland was contributorily negligent. Implicit in the instructions was the trial court's conclusion that the County owed a duty to Moreland to protect him from injuries resulting from the failure to require the owner to construct a guardrail in conformity with the requirements of the U.B.C.

The jury returned a verdict for Moreland, assessed his damages at $691,982.43, and attributed to the County fifty-eight percent of the negligence that caused the damages and to Moreland forty-two percent of such negligence. The trial court set off the amount of a pre-trial settlement with a third party and entered judgment for Moreland against the County in the principal amount of $382,209.00 plus interest and costs.

On appeal, the County argued that it owed no duty to Moreland. The court of appeals disagreed and affirmed the judgment. In addressing the duty issue, the court noted that a duty may arise from either a statute or the common law. *Moreland v. Bd. of County Comm'rs*, 725 P.2d at 3. It held that there was no statutory duty owed by the County to Moreland because resolution 1973–130, by which the

---

**5.** Moreland testified that he consumed two beers at bars where he and Cole stopped on the way to the cabin and that he had about half a cup of wine while at Cole's residence.

**6.** In the briefs the parties also discuss a theory that the County's alleged actual knowledge of the absence of a guardrail and failure to require the builder to correct the condition provided a further basis for a finding of negligence. The jury instructions make no reference to this theory. The closing arguments were not made part of the record. Therefore, we do not address this possible ground for a finding of negligence.

U.B.C. was adopted, did not provide for civil liability. *Id.* In so ruling, the court relied on *Quintano v. Industrial Commission,* 178 Colo. 131, 495 P.2d 1137 (1972). The court of appeals held, however, that because the County took affirmative steps to pass and enforce a building code to alleviate the hazards of poor construction standards, "a common law duty to use reasonable care to protect foreseeable plaintiffs arose." *Moreland,* 725 P.2d at 4. Therefore, the court of appeals concluded, the issues of breach, damages and causation were factual determinations to be made by the jury under the standard instructions given by the trial court. The court of appeals also rejected the County's contention that under the doctrine of official immunity, the County is insulated from liability. *Id.*

The County petitioned for certiorari, and we granted that petition to review the court of appeals' resolution of the duty and official immunity issues.

II.

This is a negligence case. An essential element of a negligence claim is the existence of a duty owed by the defendant to the plaintiff. *E.g., Leake v. Cain,* 720 P.2d 152, 155 (Colo.1986); *Roessler v. O'Brien,* 119 Colo. 222, 226–27, 201 P.2d 901, 903 (1949). A duty may have its source in either a legislative enactment or in the common law. *Dare v. Sobule,* 674 P.2d 960, 963 (Colo.1984).[7] Ordinarily, whether the defendant owes such a duty is a question of law to be determined by the court. *Univ. of Denver v. Whitlock,* 744 P.2d 54, 56 (Colo.1987); *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987); *Jefferson County School Dist. R–1 v. Justus,* 725 P.2d 767, 769 (Colo.1986).

In this case, the trial court by its instructions to the jury implicitly ruled that the County had a duty to Moreland to assure that the building plans for the cabin included a guardrail for the deck as required by the U.B.C. and to inspect the cabin as it was being built to assure that the guardrail was constructed in accordance with such plans. Furthermore, the trial court instructed the jury that Moreland could recover for injuries resulting from the breach of such duty.[8]

Moreland does not assert that the County had any such duty at common law prior to the adoption of the U.B.C. Therefore, any duty must derive from the resolution by which the board adopted the U.B.C. or from the U.B.C. itself. The County contends that no duty can arise from the resolution or the U.B.C. because neither reflects an intent that persons such as Moreland may use these legislative enactments as the basis for civil liability.[9] The County

---

7. In *Leake v. Cain,* 720 P.2d 152 (Colo.1986), we abolished the public duty doctrine in Colorado. Whereas at an earlier time it would have been necessary to inquire whether a duty owed by a governmental entity was a general duty owed to the public at large and thus not enforceable by an individual, or a special duty imposed for the benefit of particular individuals or classes and therefore privately enforceable, after *Leake v. Cain* such a distinction is no longer relevant. In that case we held that "a plaintiff seeking damages against a public entity must establish the existence of a duty using conventional tort principles, such as foreseeability, in the same manner as if the defendant were a private entity. 720 P.2d at 160. For examples of earlier cases applying the public duty doctrine, *see, e.g., Richardson v. Belknap,* 73 Colo. 52, 213 P. 335 (1923); *People v. Hoag,* 54 Colo. 542, 131 P. 400 (1913); *Miller v. Ouray Elec. Light & Power Co.,* 18 Colo.App. 131, 70 P. 447 (1902).

8. In instruction no. 2, setting forth the parties' theories of the case, the court summarized the plaintiff's contentions:

The plaintiff claims that on March 10, 1982, he suffered personal injury damages as a result of a fall from a porch which did not have the guardrail required by the Uniform Building Code along its north edge. The plaintiff further claims that one of the reasons the guardrail was not present was because of negligence on the part of the defendant in failing to require and in failing to check plans or blue prints for the house, and in failing to properly inspect the construction of the house.

The court then correctly instructed the jury on negligence, causation, and damages.

9. The County raised its absence of duty argument in its motion for summary judgment prior to trial and preserved the argument at all relevant times in the trial and post-trial proceedings.

relies on *Quintano v. Industrial Commission*, 178 Colo. 131, 495 P.2d 1137 (1972), to establish this proposition. We agree that based on *Quintano*, the absence of a clear expression of legislative intent to allow a civil liability remedy for breach of the obligations imposed on the County by the U.B.C. precludes recovery by Moreland in this case. It is therefore unnecessary to resolve the issue of the County's duty to Moreland by engaging in an analysis under conventional tort principles—the approach suggested in *Leake v. Cain*, 720 P.2d at 160.

In *Quintano*, the plaintiff was a worker in an industrial plant and brought an action against the Industrial Commission of Colorado and its three commissioners. The plaintiff alleged that he had suffered injuries from a machine malfunction and that the injuries resulted from the failure of the industrial commission to comply with its statutory duty to inspect all factories in which laborers are employed in order to protect them from damages arising from imperfect or dangerous machinery. The trial court granted a motion to dismiss the complaint, and the court of appeals affirmed. On certiorari, we affirmed dismissal of the complaint against the industrial commission based on the doctrine of sovereign immunity then in effect. We also affirmed the dismissal of the claim as to the individual commissioners, holding that in the absence of a clearly expressed legislative intent to impose civil liability for violation of the statute, we would not infer such an intent. We stated:

In [*Evans v. Board of County Commissioners*, 174 Colo. 97, 482 P.2d 968 (1971)], we said in effect that there are certain fields, such as sovereign immunity, in which the courts should leave establishment of substantive law to the legislative branch. We have the same view as to the matter under consideration. If the General Assembly has the intent that employees and guests may use this statute as the basis for civil liability, then its expression of this intent should be loud and clear, by authorizing the remedy. This is not a subject in which we should attempt to infer such a

legislative intent. We hold, therefore, that the petitioner may not use the statute as a basis for recovery.

*Quintano*, 178 Colo. at 135–36, 495 P.2d at 1139.

*Quintano* was a nonfeasance case. The plaintiff sought to impose civil liability for the industrial commission's failure to conduct the inspections that the statute required. The present case, in contrast, is at least in part a misfeasance case. Moreland contends that by issuing the building permit, the county officials undertook affirmative action and negligently performed the duties undertaken. Specifically, the assessor issued a building permit after the U.B.C. was in effect without requiring that plans be submitted and reviewed for building code compliance as the U.B.C. requires. Furthermore, Moreland asserts, the County was negligent in inspecting or failing to inspect the cabin for code compliance while construction was in progress.

The court of appeals held under *Quintano* that the County had no statutory duty to protect Moreland from injury simply as a result of the adoption of the U.B.C. because of the absence of a private right of action provision in the resolution of adoption. Neither party contests the correctness of this holding. The court then concluded, however, that the County had a "common law duty" derived from the affirmative steps taken by the County to pass and enforce the U.B.C. *Moreland*, 725 P.2d at 4. We believe that the use of the term "common law duty" is somewhat misleading. No such duty existed until the board adopted the U.B.C. Any such duty, therefore, had its source in resolution 1973–130, which made the U.B.C. applicable in La Plata County. As we read the court of appeals opinion, the court used "common law duty" to describe a duty to act with due care in performing governmental functions under the U.B.C., i.e., a duty not to engage in misfeasance with respect to administering the U.B.C. Even if the County's negligence is properly characterized as misfeasance, however, we conclude that Moreland has no civil liability remedy against the County for damages caused by the County's negligence. The lesson of

*Quintano* is that before a private civil liability remedy will be recognized for injuries resulting from a breach of obligations legislatively imposed on a governmental entity and unknown at common law, a clear expression of legislative intent must be found. *See Bittle v. Brunetti,* 750 P.2d 49, 57–58 (Colo.1988) (discussing *Quintano*).[10] Nothing in *Quintano* suggests that this principle is in any way dependent upon whether the breach results from nonfeasance or from misfeasance.[11] In the present case, neither the U.B.C. nor the resolution by which the County adopted it contains any indication that a private civil liability remedy was contemplated for negligent violations of the U.B.C. by the County.

Our conclusion that the absence of provisions in the resolution or the U.B.C. for a civil liability remedy against the County precludes Moreland's claim in this case is further strengthened by the fact that remedies are specifically provided by the statute authorizing enactment of the U.B.C. and by the U.B.C. itself against persons, firms or corporations who violate the U.B.C.[12] This reflects that the state legislature and the

10. In *Leake v. Cain,* 720 P.2d 152 (Colo.1986), as previously noted, we abolished the public duty doctrine. In analyzing whether Colorado's emergency commitment statute, § 25–1–310(1), 11 C.R.S. (1982), imposed a duty on police officers to prevent an intoxicated person from harming others, we held that "the breach of a statutory duty is actionable only by one who is a member of the class the statute was designed to protect, and only where the injury suffered by such person is the type of injury which the statute was enacted to prevent." *Leake v. Cain,* 720 P.2d at 162. We held that the injured parties "were not included within the class of persons that section 25–1–310(1) was designed to protect" and therefore the injured parties "may not rely on the statute as a source of the officers' duty in this case." In assessing whether the emergency commitment statute gave rise to liability in *Leake v. Cain,* therefore, we had no occasion to consider the applicability of the *Quintano* requirement of a clear expression of legislative intent to permit a civil action in damages as a remedy for a breach of the obligations imposed on law enforcement authorities under the statute. Although we did not mention *Quintano* in our analysis of the duty issue under the emergency commitment statute, we had noted the case earlier and interpreted it as denying liability not on the basis of the public duty rule but "[b]ecause the statute in question did not authorize a private cause of action for its violation." *Id.* at 157.

11. In 1986, the General Assembly adopted § 24–10–106.5, 10A C.R.S. (1988), which provides:

(1) In order to encourage the provision of services to protect the public health and safety and to allow public entities to allocate their limited fiscal resources, a public entity or public employee shall not be deemed to have assumed a duty of care where none otherwise existed by the performance of a service or an act of assistance for the benefit of any person. The adoption of a policy or a regulation to protect any person's health or safety shall not give rise to a duty of care on the part of a public entity or public employee where none otherwise existed. In addition, the enforcement of or failure to enforce any such policy or regulation or the mere fact that an inspection was conducted in the course of enforcing such policy or regulation shall not give rise to a duty of care where none otherwise existed; however, in a situation in which sovereign immunity has been waived in accordance with the provisions of this article, nothing shall be deemed to foreclose the assumption of a duty of care by a public entity or public employee when the public entity or public employee requires any person to perform any act as the result of such an inspection or as the result of the application of such policy or regulation. Nothing in this section shall be construed to relieve a public entity of a duty of care expressly imposed under other statutory provisions.

(2) Nothing in this article shall be deemed to create any duty of care.

§ 24–10–106.5 is not applicable to this case, which arose before its enactment. We express no opinion on the effect of this statute on the issues that we resolve in the present case under the law as it existed prior to the adoption of § 24–10–106.5.

12. § 30–28–209, 12A C.R.S. (1986), which governs violations of building codes, provides:

Any person, firm, or corporation violating this part 2 or any provision of the area building code is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than one hundred dollars, or by imprisonment in the county jail for not more than ten days, or by both such fine and imprisonment. Each day during which such illegal erection, construction, reconstruction, alteration, maintenance, or use continues shall be deemed a separate offense. In case any building or structure is or is proposed to be erected, constructed, reconstructed, altered, remodeled, used, or maintained in violation of this part 2 or of any provision of the area building code, the district attorney of the district, the board of county commissioners,

board gave thought to the issue of civil liability but made no provision for imposition of such liability against the County.

Decisions of this court and of the Colorado Court of Appeals subsequent to *Quintano* and involving claims against nongovernmental defendants also reinforce the conclusion that the absence of a legislative provision for a civil damages remedy against the County forecloses us from recognizing such a remedy. In *Farmers Group, Inc. v. Trimble*, 658 P.2d 1370 (Colo.App.1982), *aff'd on other grounds*, 691 P.2d 1138 (Colo.1984), the defendant policyholder, in a counterclaim, contended that the plaintiff insurance companies had breached certain statutory duties set forth in sections 10–3–1101 to –1112, 4 C.R.S. (1973 & 1981 Supp.), and sought damages as a remedy. The court of appeals, in addressing the defendant's claim, examined the statutory scheme under which the plaintiffs' duties arose and concluded that it did not expressly provide for or authorize a private civil remedy. *Trimble*, 658 P.2d at 1377–78. The court noted that the statute defined several legal duties of insurers and provided numerous sanctions for failure to perform such duties. It then observed that the legislature could have added the remedy of a private civil action but did not do so. The court held that in absence of any indication of contrary legislative intent, the specific remedies designated by the legislature excluded all others. *Id.* at 1378, citing *Quintano*, 178 Colo. 131, 495 P.2d 1137 (1972). Consequently, the court concluded that the statute could not constitute the sole basis for a civil action instituted by private citizens allegedly aggrieved by the conduct of their insurers. *Id.*

In *Silverstein v. Sisters of Charity*, 38 Colo.App. 286, 559 P.2d 716 (1976), the plaintiff, a physically disabled person, sued two health care corporations, claiming that they had discriminated against her in violation of section 24–34–801(1)(b), 10A C.R.S. (1988), when they refused to hire her as a respiratory therapist. The statute did not expressly provide for a private right of action but did provide a criminal penalty for violation of the statute. In rejecting the plaintiff's argument that a private right of action should be implied, the court held:

> The relevant portions of that statute confer new rights and duties, unknown at common law, and provide criminal penalties for violations thereof. Where a statute creates legal duties and provides a particular means for their enforcement, the designated remedy excludes all others. *Colorado Cent. R. Co. v. Humphreys*, 16 Colo. 34, 26 P. 165 (1891). *See also Board of County Commissioners v. HAD Enterprises, Inc.*, 35 Colo. App. 162, 533 P.2d 45 (1974). Here, there is no question but that the legislature could have authorized civil penalties for violation of the act. *See* § 24–34–502 C.R.S. 1973; *cf. W.T. Grant Co. v. Casady*, 117 Colo. 405, 188 P.2d 881 (1948). However, it chose to impose only a criminal sanction. Therefore, we have no authority to impose civil liability. *Quintano v. Industrial Commission*, 178 Colo. 131, 495 P.2d 1137 (1972). *See also Swenson v. LaShell*, 118 Colo. 333, 195 P.2d 385 (1948).

*Id.* at 288–89, 559 P.2d at 718.

*Trimble* and *Silverstein* cited *Quintano* in addressing the implied private right of

---

or any owner of real estate within the area, in addition to other remedies provided by law, may institute an appropriate action for injunction, mandamus, or abatement to prevent, enjoin, abate, or remove such unlawful erection, construction, reconstruction, alteration, remodeling, maintenance, or use.

Section 205 of the 1973 U.B.C., which prescribed consequences of violations of the code, provided in part:

... Any person, firm, or corporation violating any of the provisions of this Code shall be deemed guilty of a misdemeanor, and each such person shall be deemed guilty of a sepa-

rate offense for each and every day or portion thereof during which any violation of any of the provisions of this Code is committed, continued, or permitted, and upon conviction of any such violation such person shall be punishable by a fine of not more than $300 or by imprisonment for not more than 90 days, or by both such fine and imprisonment.

Neither the statute nor the U.B.C. makes any provision for private civil damages remedies against persons, firms or corporations who violate the U.B.C. and cause injury thereby. We express no opinion on the availability of such a remedy as to nongovernmental defendants.

action issue in cases involving nongovernmental defendants. Although we believe that *Quintano* reflects a heightened concern about implying a private right of action in cases in which governmental defendants are involved, we agree that similar considerations are relevant but to a lesser degree in considering whether civil liability can be imposed upon nongovernmental defendants for violation of a statutorily imposed obligation unknown at common law. In each case, the ultimate issue is, one of legislative intent.

We considered whether a remedy not explicitly prescribed in a statute could be inferred from the entire statutory scheme in *Board of County Commissioners v. Pfeifer*, 190 Colo. 275, 546 P.2d 946 (1976). *Pfeifer* involved a question of remedies available against private persons for violations of subdivision laws. In that case the Pitkin County Board of County Commissioners sought to set aside a conveyance, or in the alternative, to enjoin the grantee from any use of the deeded property until the grantor complied with applicable state and local subdivision laws. The plaintiff contended, among other things, that because the conveyance violated state and county subdivision laws, it was illegal and void, and thus could be set aside. We held that the relevant statute provided for a criminal penalty or injunctive relief to prevent such a conveyance but contained no provision giving the county authority to set aside a conveyance. *Pfeifer*, 190 Colo. at 279, 546 P.2d at 948. In so concluding, we stated that "in this case the legislature has

clearly and expressly established the remedies available to the Board in order to enforce its subdivision requirements, and they are so limited." *Id.* at 280, 546 P.2d at 949. *See also American Television & Communications Corp. v. Manning*, 651 P.2d 440, 447 (Colo.App.1982) ("... where a statute creates legal duties which were non-existent at common law and provides a particular means for their enforcement, the designated remedy is exclusive, and courts should not imply new remedies to accompany the new right in the absence of some legislative indication or other circumstances that such a result was intended."); *Hargreaves v. Skrbina*, 635 P.2d 221, 227 (Colo.App.1981), *aff'd in part, rev'd in part on other grounds*, 662 P.2d 1078 (Colo.1983) ("... since no specific legislative authorization for attorneys' fees appears in the Longmont ordinance granting plaintiffs standing to bring this suit [to remove a structure that did not conform to the city's setback ordinance] an award of attorneys' fees would be improper."); *Bd. of County Comm'rs v. HAD Enterprises, Inc.*, 35 Colo.App. 162, 164, 533 P.2d 45, 46 (1974) ("[the statute] provides [in addition to other specified remedies for violation of an open records act] that one who violates the terms thereof shall be guilty of a misdemeanor and may be subject to a fine and imprisonment. These provisions are the sole remedies under the act.... [W]here the legislature has not seen fit to authorize a particular remedy in a statute, we cannot supply one.").[13]

---

**13.** The issue of the remedies available for violation of a statutorily-created obligation has arisen in another line of Colorado cases addressing the standing of a party to bring an action. In *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977), we held that "[t]he proper inquiry on standing is whether the plaintiff has suffered injury in fact to a legally protected interest as contemplated by statutory or constitutional provisions." *Id.* at 168, 570 P.2d at 539. In *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, 620 P.2d 1051 (Colo.1980), we stated that when the source of the legally protected interest is a statute, we must inquire whether the plaintiff's complaint sufficiently alleges that he sustained an injury in fact to an interest that as a matter of law, is entitled to legal protection under the statute. *Id.* at 1057. "The conclusion that an injury is actionable

'rests on a normative judicial judgment ... derived from a determination [that] *the substantive law invoked creates a personal interest or right in the complainant* that has been infringed by the challenged action.'" *Id.* at 1058 (quoting Albert, *Justiciability and Theories of Judicial Review: A Remote Relationship*, 50 S.Cal.L.Rev. 1139 (1977)) (emphasis in *Cloverleaf Kennel Club* but not in original). To aid our inquiry, we adopted the following guidelines:

In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First ... does the statute create a ... right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying

■ In summary, no private civil damage remedy exists for any nonfeasance or misfeasance of the County in administering the U.B.C. The trial court erred in concluding to the contrary and in so instructing the jury.[14]

· We reverse the judgment of the court of appeals and return the case to that court for remand to the trial court with directions to vacate its judgment and dismiss the complaint.[15]

ERICKSON, J., concurs.

ERICKSON, Justice, concurring:

In my view, although the majority reaches the proper conclusion that Moreland cannot maintain a claim against La Plata County, the majority's reliance upon *Quintano v. Industrial Commission*, 178 Colo. 131, 495 P.2d 1137 (1972), is misplaced. The majority states that where a statute creates new legal duties and provides a particular means for their enforcement, the remedy designated in the statute excludes all other remedies. The majority reads "remedy designated" as synomyous with the class of persons against whom a claim may lie. Where a class of persons who can bring suit is enumerated in a statute, all other unenumerated classes are denied the right to seek recovery under the statute. Since the Uniform Building Code (UBC) remedy provision expressly enumerated "person, firm, or corporation" as those who could be held liable for violating its provisions, but omitted "counties" from the list, the designated list of parties subject to liability under the UBC is exclusive. With this I agree.

However, I note that where a party is listed in the statute as one against whom recovery can be sought, the proper analysis to determine whether that party is liable is contained in *Leake v. Cain*, 720 P.2d 152 (Colo.1986). In *Leake v. Cain*, five Commerce City police officers arrested Ralph Crowe at a party when he became disruptive. They later released Crowe based on ·his brother's assurance that he would drive

purposes of the legislative scheme to imply such a remedy for the plaintiff?
*Cloverleaf Kennel Club*, 620 P.2d at 1058 (quoting *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975)). We have followed *Cloverleaf Kennel Club* in a number of standing cases. *See State v. Colorado State Personnel Bd.*, 722 P.2d 1012 (Colo.1986); *Ram Broadcasting of Colorado, Inc. v. Pub. Util. Comm'n*, 702 P.2d 746 (Colo.1985); *Friends of Chamber Music v. City and County of Denver*, 696 P.2d 309 (Colo. 1985); *Denver Center for Performing Arts v. Briggs*, 696 P.2d 299 (Colo.1985); *State Bd. for Community Colleges v. Olson*, 687 P.2d 429 (Colo.1984). The *Quintano* standard regarding implied rights of action addresses the same concerns reflected in the second and third factors of the *Cloverleaf Kennel Club* standing analysis. *See Holter v. Moore and Co.*, 681 P.2d 962, 964–65 (Colo.App.1983).

14. We also accepted certiorari to review the following aspect of the duty issue:
Whether, under the assumption of duty doctrine set forth in *Jefferson County School District v. Justus*, 725 P.2d 767 (Colo.1986), and *Jefferson County School District v. Gilbert*, 725 P.2d 774 (Colo.1986), the court of appeals erred in concluding that petitioner's adoption of a building code and provisions to enforce that code resulted in assumption of a duty to inspect the premises at which respondent was injured.
After reviewing the briefs and considering argument, we conclude that the assumption of duty analysis is not applicable here. First, the plaintiff did not rely on such a theory in the trial court, in the briefs in the court of appeals or in the briefs in this court. Moreover, we do not believe that action taken to comply with legislative requirements can properly be characterized as voluntarily assumed, or that the adoption of a resolution by a board of county commissioners, pursuant to an enabling statute, imposing obligations on county officials, is the type of voluntary action comprehended within the assumed duty doctrine. *See Jefferson County School Dist. R–1 v. Justus*, 725 P.2d 767 (Colo. 1986); *Jefferson County School Dist. R–1 v. Gilbert*, 725 P.2d 774 (Colo.1986); Restatement (Second) Torts, § 323, 324 A (1965). Additionally, the legislation pursuant to which the U.B.C. was adopted contains its own set of remedies, and the issue of the existence of a private right of action for breach of any duty created by adoption and implementation of the U.B.C., even if it could be viewed as an assumed duty, is properly to be analyzed under the standards of *Quintano*.

15. We also granted certiorari as to the following issue:
Whether the doctrine of discretionary immunity or considerations of public policy render petitioner immune for negligent building inspection.
In light of our holding today, we need not address this question.

Crowe home. Later that evening a vehicle driven by Crowe struck six pedestrians, killing two of them. Crowe's blood alcohol content at the time of the accident was .20, well in excess of the legal presumption of intoxication in Colorado.

Respondents filed a wrongful death action against, *inter alia,* the five Commerce City police officers and Commerce City. We determined that under section 25–1–310(1), 11 C.R.S. (1982), the police officers had no duty to take Crowe into custody or to escort him home. In finding no statutory duty, *Leake* applied the two-pronged standard rejected by *Quintano:* "[T]he breach of a statutory duty is actionable only by one who is a member of the class the statute was designed to protect, and only where the injury suffered by such person is the type of injury which the statute was enacted to prevent." *Leake v. Cain,* 720 P.2d at 161. *See also Largo Corp. v. Crespin,* 727 P.2d 1098 (Colo. 1986); *Dunbar v. Olivieri,* 97 Colo. 381, 50 P.2d 64 (1935); *Richardson v. Belknap,* 73 Colo. 52, 213 P. 335 (1923); *People v. Hoag,* 54 Colo. 542, 131 P. 400 (1913).

I believe that *Quintano* should be overruled. The *Quintano* standard is inconsistent with the standard applied in *Leake v. Cain* and *Largo Corp. v. Crespin.* Under the extremely narrow *Quintano* standard, a duty will rarely, if ever, be created by statute. To give continued vitality to *Quintano* in this case undermines the validity of *Leake v. Cain.* Accordingly, *Quintano* should be overruled in favor of the better reasoned standard set forth in *Leake v. Cain.*