2015 COA 12. No. 15CA0164. Denver Health and Hospital Authority v. City of Arvada ex rel. Arvada Police Department.
 
  

 
 
 COLORADO COURT OF APPEALS
 2016 COA 12

 
 

 Court of Appeals No. 15CA0164
City and County of Denver District Court No. 14CV31049
Honorable Kenneth M. Laff, Judge

 Denver Health and Hospital Authority,
 Plaintiff-Appellee,
 v.
 City of Arvada ex rel. Arvada Police Department,
 Defendant-Appellant.

 JUDGMENT AFFIRMED
 Division III
Opinion by CHIEF JUDGE LOEB
Márquez*, J., concurs
Vogt*, J., specially concurs
 Announced January 28, 2016

 Ruegsegger Simons Smith & Stern, LLC, Jeff C. Staudenmayer, Denver, Colorado, for Plaintiff-Appellee
 Christopher K. Daly, City Attorney, Roberto Ramírez, Senior Assistant City Attorney, Arvada, Colorado, for Defendant-Appellant
 Senter Goldfarb & Rice, LLC, Eric M. Ziporin, Jennifer F. Kemp, Denver, Colorado, for Amicus Curiae Colorado Intergovernmental Risk Sharing Agency
 Polsinelli PC, Gerald A. Niederman, Ann McCullough, Bennett L. Cohen, Denver, Colorado, for Amicus Curiae Colorado Hospital Association
 D. Scott Martinez, City Attorney, Tracy A. Davis, Assistant City Attorney, Joshua L. Roberts, Assistant City Attorney, T. Shaun Sullivan, Assistant City Attorney, Denver, Colorado, for Amicus Curiae City and County of Denver
 *Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2015.
  
 ¶1        Defendant, City of Arvada (Arvada), appeals from the summary judgment entered by the district court in favor of plaintiff, Denver Health and Hospital Authority (Denver Health). Specifically, Arvada contends that section 16-3-401(2), C.R.S. 2015, is void for vagueness; that the district court misinterpreted Poudre Valley Health Care Inc. v. City of Loveland, 85 P.3d 558 (Colo. App. 2003); and that the court erred in concluding that Denver Health’s implied contract claim was not barred by the Colorado Governmental Immunity Act (CGIA), §§ 24-10-101 to -120, C.R.S. 2015. We affirm.
 I. Background and Procedural History
 ¶2        The following undisputed facts are taken from the parties’ stipulation of facts, filed with the district court.
 ¶3        On the morning of March 24, 2012, Arvada police officers Schleser and Lechuga (the officers) were dispatched to a residence in response to a domestic disturbance call. Upon arrival, the alleged victim was waiting outside of the residence. She told the officers that her husband, Terry Ross, had hit her, head-butted her, twisted her left arm, and had waved a gun back and forth during the alleged domestic violence. 
 ¶4        The officers went to the residence to speak with Ross. After the officers rang the doorbell, knocked on the front door, and knocked on windows multiple times, Ross eventually answered the door and allowed the officers inside the residence. The five-year-old son of Ross and the alleged victim was also inside.
 ¶5        Ross agreed to speak with the officers but asked to use the bathroom before the officers began asking him questions. Officer Schleser checked the bathroom for any guns, knives, razor blades, and prescription medications as a safety measure, and after not finding any, she allowed Ross to use the bathroom. Officer Lechuga took the son outside and began talking to him while Officer Schleser waited inside the house.
 ¶6        When Ross came out of the bathroom, he abruptly turned to enter a bedroom in the house. Officer Schleser ran after him, and as the bedroom door began to close, she saw Ross holding a handgun and pointing it out in front of him. Believing Ross was going to shoot her, Officer Schleser fired her gun at him as the bedroom door was closing. However, when she opened the bedroom door, Officer Schleser was unable to find Ross inside the room. Unbeknownst to both officers, Ross had left the bedroom and attempted to commit suicide with his handgun.
 ¶7        Officer Lechuga later spotted Ross walking out from behind a wall in the house and commanded him to get on the ground and put his hands behind his back. Ross complied, and Officer Lechuga handcuffed him. After seeing blood on Ross’ face, neck, and chest area, the officers notified dispatch that Ross needed an ambulance immediately. When the ambulance arrived, Officer Lechuga escorted Ross to the ambulance and handcuffed him to the inside of the ambulance. Officer Lechuga followed the ambulance to Denver Health and remained there until a police detective arrived.
 ¶8        Ross received medical treatment at Denver Health for a self-inflicted gunshot wound to the face. A police officer or detective was always with Ross or outside his hospital room to ensure he did not leave Denver Health, and he was eventually transported to a secure wing of the hospital, which was continually monitored by the Denver Sheriff’s Department. He was released the next day into the custody of the Arvada Police Department.
 ¶9        This case began in March 2014, when Denver Health filed a complaint against Arvada for payment of Ross’ medical expenses incurred at the hospital. Denver Health alleged two claims for relief, asserting that it was entitled to payment from Arvada for Ross’ medical expenses: (1) a statutory claim pursuant to section 16-3-401(2), as interpreted by Poudre Valley, 85 P.3d at 560-61; and (2) a claim under an implied contract theory. The charges for Ross’ medical care totaled $34,591.83, but Denver Health received $5327.14 in payment directly from Ross’ estate after he committed suicide in April 2012. Thus, Denver Health sought $29,264.69 from Arvada.
 ¶10        As noted, the parties stipulated to the material facts in this case, and they agreed that summary judgment was appropriate to determine whether Arvada was liable for Ross’ medical expenses. They filed competing summary judgment motions in the district court. Relying in part on Poudre Valley,[1] the district court denied Arvada’s motion for summary judgment and granted summary judgment in favor of Denver Health, ruling that Denver Health was entitled to reimbursement from Arvada for Ross’ medical expenses under section 16-3-401(2). The court also ruled that Denver Health’s implied contract claim was not barred by the CGIA. This appeal followed.[2]
 II. Void for Vagueness Challenge
 ¶11        Arvada contends that section 16-3-401(2) is unconstitutionally vague on its face because it does not expressly define the term “in custody” and does not address at what point in time one looks to see if an individual is in custody. Arvada argues that because there are multiple definitions of “custody” that may be applicable to section 16-3-401(2), it is unclear when it and other local governmental entities may be financially responsible for an injured individual’s medical expenses. Thus, Arvada contends the statute is void for vagueness because it is capable of two or more constructions leading to different results, and it argues that the statute’s lack of clarity has a chilling effect that will cause illogical and absurd results. We conclude the statute is not void for vagueness.
 A. Standard of Review
 ¶12        We review a district court’s grant of a motion for summary judgment de novo. Metal Mgmt. W., Inc. v. State, 251 P.3d 1164, 1170 (Colo. App. 2010). Additionally, the constitutionality of a statute is a legal question that we review de novo. People v. Allman, 2012 COA 212, ¶7. We presume that a statute is constitutional, and the party challenging the statute must establish its unconstitutionality beyond a reasonable doubt. Id.
 ¶13        Our primary task when interpreting a statute is to ascertain and give effect to the legislative purpose underlying it. Id. at ¶20. “If the statute is not ambiguous, we look only to its plain language and give words and phrases their ordinary meaning.” Id.
 B. Void for Vagueness Principles
 ¶14        A statute is void for vagueness “where its prohibitions are not clearly defined and it is reasonably susceptible of more than one interpretation by a person of common intelligence.” Id. at ¶18 (quoting People v. Clendenin, 232 P.3d 210, 216 (Colo. App. 2009)). Vague laws are unconstitutional and “offend due process because they (1) fail to give fair notice of the conduct prohibited, and (2) do not supply adequate standards for those who apply them in order to prevent arbitrary and discriminatory enforcement.” People v. Baer, 973 P.2d 1225, 1233 (Colo. 1999).
 ¶15        However, due process of law “has never required mathematical exactitude in legislative draftsmanship.” Metal Mgmt., 251 P.3d at 1171. A provision is not unconstitutionally vague simply because it could have been drafted with greater precision. Id. Statutes must be drafted to be both sufficiently specific to give fair warning of prohibited conduct and sufficiently general to address the “essential problem under varied circumstances and during changing times.” Id. (quoting Colo. Auto. & Truck Wreckers Ass’n v. Dep’t of Revenue, 618 P.2d 646, 651 (Colo. 1980)).
 ¶16        “Ultimately, the degree of vagueness tolerated by the Constitution, and the level of scrutiny a court must use in reviewing a vagueness challenge, depend on the nature of the enactment being challenged.” Id. “Where, as here, a statute does not burden protected speech, the constitution permits a greater degree of vagueness.” Baer, 973 P.2d at 1233.
 ¶17        In such a case, a court should sustain a facial challenge to a statute “only where the ‘enactment is impermissibly vague in all of its applications.’” Id. (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495-96 (1982)); People v. Nerud, 2015 COA 27, ¶17; see also People v. Shell, 148 P.3d 162, 172 (Colo. 2006) (To succeed on a facial void for vagueness challenge, a party must show that the challenged provision is incomprehensible in all of its applications); People v. McCoy, 2015 COA 76M, ¶65. The statute must be “vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.” Nerud, ¶17 (quoting People v. Hickman, 988 P.2d 628, 643 (Colo. 1999)). A statute is not vague on its face if a person of normal intelligence has fair notice of what acts are proscribed. Id. “If the statute survives a facial challenge, a litigant may succeed on a vagueness claim only by demonstrating that the statute is impermissibly vague as applied to him or her.” Baer, 973 P.2d at 1233.
 C. Vagueness Analysis of Section 16-3-401(2)
 ¶18        Arvada contends that section 16-3-401(2) is unconstitutionally vague on its face. It does not argue that the statute is void for vagueness as applied. Applying the above principles, we conclude that section 16-3-401(2) is not void for vagueness on its face.
 ¶19        We begin our analysis of Arvada’s void for vagueness challenge by looking to the plain language of the applicable statutes, all of which are contained in the Colorado Code of Criminal Procedure, §§ 16-1-101 to 16-13-906, C.R.S. 2015.
 ¶20        Section 16-3-401(2) states: “Persons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment. Anyone receiving medical treatment while held in custody may be assessed a medical treatment charge as provided in section 17-26-104.5, C.R.S.”[3](Emphasis added.) 
 ¶21        The definitions section of the Code, section 16-1-104(1), C.R.S.2015, provides:
 The following definitions in this section are applicable generally in this code. Other terms which need definition, but which are used only in a limited number of sections of this code are defined in the particular section or article in which the terms appear. Definitions set forth in any section of this code are applicable whenever the same term is used in the same sense in another section of this code, unless the definition is specifically limited or the context indicates that it is inapplicable.
 Section 16-1-104(9) specifically defines the word “custody” as meaning “the restraint of a person’s freedom in any significant way.” Section 16-3-401(2), by its express terms, does not otherwise limit the definition of “custody” in section 16-1-104(9), nor does it provide that this definition is inapplicable.
 ¶22        We conclude that the language of section 16-3-401(2), read together with the statutory definition of “custody” in section 16-1­104(9), is unambiguous, making it unnecessary to look beyond the words of the statute. See Allman, ¶20. Viewing this statutory framework as a whole, we further conclude that section 16-3-401(2) is sufficiently specific to provide the constitutionally required guidance to individuals seeking to comply with the law and to individuals seeking to enforce the statute. See Baer, 973 P.2d at 1233. Because the General Assembly has defined the term “custody” in section 16-1-104(9), and that definition is applicable to the entire Colorado Code of Criminal Procedure pursuant to section 16-1-104(1), section 16-3-401(2) on its face requires all persons who are arrested, or persons whose freedom is restrained in any significant way, to be treated humanely and provided with adequate food, shelter, and, if necessary, medical treatment. See §§ 16-1­104(9), 16-3-401(2); see also Poudre Valley, 85 P.3d at 560. While determining whether a person’s freedom is restrained “in any significant way” will likely require a case-by-case, fact-specific inquiry, this is not a basis to strike down an entire statutory provision as void for vagueness. Rather, the test only requires that statutes must be drafted to be both sufficiently specific to give fair warning of prohibited conduct and sufficiently general to address the “essential problem under varied circumstances and during changing times.” Metal Mgmt., 251 P.3d at 1171 (quoting Colo. Auto. & Truck Wreckers Ass’n, 618 P.2d at 651); see Nerud, ¶¶17­18. In our view, section 16-3-401(2) easily passes that test.
 ¶23        Furthermore, section 16-3-401(2) is not facially void for  vagueness because it is not “impermissibly vague in all of its applications.” Baer, 973 P.2d at 1233 (quoting Flipside, 455 U.S. at 495-96). Indeed, in its opening brief, Arvada itself lists several situations in which it agrees a governmental entity should be responsible for providing and paying for medical care for individuals, including when individuals are injured by police officers while being placed in handcuffs or placed in the back of a police car, and when pretrial detainees or post-trial prisoners become sick or injured. See also Poudre Valley, 85 P.3d at 560 (section 16-3­401(2) imposes a duty on a detaining governmental entity to provide and pay for medical care for pretrial detainees). Thus, it is clear that section 16-3-401(2) can be interpreted to require a governmental entity to treat humanely and provide food, shelter, and medical care to persons “arrested or in custody.” Therefore, section 16-3-401(2) is not “impermissibly vague in all of its applications,” and we conclude that the statute is not void for vagueness on its face. Baer, 973 P.2d at 1233 (quoting Flipside, 455 U.S. at 495-96); Nerud, ¶¶17-18.
 ¶24        We are not persuaded by Arvada’s reliance on People v. Thornton, 929 P.2d 729 (Colo. 1996) and People v. Sinovcic, 2013 COA 38, for the proposition that although “custody” is defined in section 16-1-104(9), that definition does not apply in all situations. These cases are inapposite and simply not relevant to the definition of custody that is applicable to section 16-3-401(2).
 ¶25        In Thornton, the supreme court interpreted the term “in custody or confinement” as it appears in the escape statute, section 18-8-208(3), C.R.S. 2015, and explicitly stated that the definition of “custody” in section 16-1-104(9) does not apply to the escape statute. Thornton, 929 P.2d at 730, 734. In Sinovcic, a division of this court interpreted “custody” as it appears in section 18-1.3­701(5)(a), C.R.S. 2015. Sinovcic, ¶¶25-27. Both of those cases dealt with entirely different statutory provisions than section 16-3­401(2), and, thus, neither is applicable to this case. As discussed above, the definition of “custody” in section 16-1-104(9) unambiguously applies to section 16-3-401(2).
 ¶26        Arvada also argues that applying the definition of “custody” in section 16-1-104(9) to section 16-3-401(2) will cause a chilling effect and illogical and absurd results. In that regard, Arvada lists several hypothetical examples where individuals may be in “custody” according to the definition contained in 16-1-104(9), and it argues that if all of these individuals require medical care, law enforcement agencies may face costly financial liability for the medical care. Arvada argues that law enforcement agencies must choose between facing costly financial liability for medical care provided to the many individuals in “custody” according to the definition in section 16-1-104(9), or not providing medical care to these individuals and facing civil liability for their failure to do so. Nonetheless, as previously described, the General Assembly has clearly expressed that the definition of “custody” in section 16-1­104(9) applies to section 16-3-401(2). And, the plain language of the statute requires governmental entities to provide and, by necessary implication, to pay for medical care for their detainees. See Poudre Valley, 85 P.3d at 560. In our view, that is not an absurd result but is a legitimate policy decision of the General Assembly. See Ceja v. Lemire, 154 P.3d 1064, 1067 (Colo. 2007). Hence, “given the statutory language,” Arvada’s “policy arguments are better addressed to the General Assembly.” Sifton v. Stewart Title Guar. Co., 259 P.3d 542, 545 (Colo. App. 2011); see also Swieckowski v. City of Fort Collins, 934 P.2d 1380, 1387 (Colo. 1997) (“We may not substitute our view of public policy for that of the General Assembly.”).
 III. Poudre Valley
 ¶27        Arvada next contends that the district court misinterpreted Poudre Valley because it incorrectly found the case to be dispositive of the issues raised in this case.[4] Arvada argues that the holding in Poudre Valley was very narrow and not applicable here, and, thus, the district court incorrectly found that pursuant to Poudre Valley, Colorado law required Arvada to reimburse Denver Health for the remaining balance of Ross’ hospital expenses. We disagree.
 A. Standard of Review
 ¶28        Whether the district court misinterpreted Poudre Valley is a question of law, and “we review de novo questions of law and. . . the application of law to undisputed facts.” Winter v. Indus. Claim Appeals Office, 2013 COA 126, ¶7; see also Candelaria v. People, 2013 CO 47, ¶10.
 B. Summary of Poudre Valley
 ¶29        In Poudre Valley, a hospital sought to recover costs for medical treatment provided to a pretrial detainee, pursuant to section 16-3­401(2). 85 P.3d at 559. Following his arrest by City of Loveland police officers, the pretrial detainee escaped through the window of a police transport van that was traveling at a high speed. Id. He was injured and received medical treatment at Poudre Valley Health Care, Inc. (the hospital), but the City of Loveland argued that there was no constitutional or statutory basis for the hospital’s claim for reimbursement of costs from the City for such medical treatment. Id.
 ¶30        On appeal, a division of this court first considered precedent from the United States Supreme Court holding that the United States Constitution requires governmental entities to provide medical care both to convicted prisoners and pretrial detainees in custody. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) (relying on the Due Process Clause of the Fourteenth Amendment); Estelle v. Gamble, 429 U.S. 97, 103-04 (1976) (relying on the prohibition against cruel and unusual punishment under the Eighth Amendment). The division acknowledged that the Court had also held that whether a detaining governmental entity is required to pay the costs incurred by a medical provider is a matter of state law. Poudre Valley, 85 P.3d at 559 (citing Revere, 463 U.S. at 245).
 ¶31        The division held that while no Colorado statute expressly addresses the allocation of costs of medical care for pretrial detainees, section 16-3-401(2) “imposes a duty on a detaining governmental entity to provide such medical care.” Poudre Valley, 85 P.3d at 560. Relying on the analysis and holdings of courts in other jurisdictions, which it found persuasive,[5] the division further held that “where, as here, a state statute unambiguously imposes a duty on governmental entities to provide medical treatment and care for detainees in their custody, such a duty includes or, at a minimum, implies an inherent obligation to pay the costs of such treatment and care.” Id. The division, therefore, concluded that the trial court had properly entered summary judgment determining that the City of Loveland was liable to the hospital for the pretrial detainee’s medical expenses. Id. at 561.
 C. Analysis
 ¶32        Arvada contends that Poudre Valley is inapplicable here because that case dealt only with the very narrow issue of whether a governmental entity has an obligation to pay for medical costs incurred in the care and treatment of a pretrial detainee already in custody. Arvada argues that Ross was not a pretrial detainee, but was merely a citizen who was contacted by the police about an alleged crime, and that Ross was not in custody when his need for medical care arose. For the reasons discussed below, we do not agree that the holding in Poudre Valley is as limited as Arvada contends. Rather, we conclude that pursuant to Poudre Valley, the duty of governmental entities to provide food, shelter, and, if necessary, medical treatment extends to all individuals “arrested or in custody,” § 16-3-401(2), and that inherent or implicit in this duty is the duty to pay for such expenses.
 ¶33        While the division in Poudre Valley framed the issue in that case as whether a governmental entity must pay the medical treatment costs of a pretrial detainee in its custody, the division spoke more broadly in holding that section 16-3-401(2) expressly imposes a duty on the detaining entity to provide medical treatment for all individuals “in custody.” 85 P.3d at 560. The division further stated that this “statutory duty in Colorado is not limited to treatment afforded individuals who have already been convicted and incarcerated.” Id. Thus, the division concluded that a detaining governmental entity has a duty to provide medical treatment, if needed, for all individuals “in custody,” and it did not limit the obligations of a detaining entity based upon the status of an injured person’s criminal proceeding. Id. Significantly, the division further emphasized that its conclusion “accords with the General Assembly’s evident intent to place the duty to provide such medical care on the entities holding the detainees.” Id.
 ¶34        Additionally, as discussed above, the division determined that section 16-3-401(2) “unambiguously imposes a duty on governmental entities to provide medical treatment and care for detainees in their custody,” and “such a duty includes or, at a minimum, implies an inherent obligation to pay the costs of such treatment and care.” Id. The division’s broad holding that a governmental entity has a duty to provide, and thus an obligation to pay for, medical expenses was not limited to pretrial detainees. Instead, the division ruled that governmental entities have a duty to provide, and, thus, an obligation to pay for, medical treatment for all detainees in their custody. Id.
 ¶35        To the extent Arvada argues that Ross was not in the custody of the Arvada police officers, we agree with the district court that based on the undisputed facts, Ross was “in custody” under section 16-3-401(2). We note that the division in Poudre Valley did not limit the application of section 16-3-401(2) based on when an individual’s need for medical treatment arose relative to when the individual was placed into custody. Id. at 560-61. Here, Ross had to ask permission to use the bathroom at his own home; Officer Schleser attempted to exercise control over Ross when firing her gun at him after he came out of the bathroom and went inside the bedroom; after escaping from the bedroom, Ross complied when the officers commanded him to get on the ground and put his hands behind his back; Ross was handcuffed by an officer, handcuffed to the inside of the ambulance, and Officer Lechuga followed the ambulance to Denver Health; a police officer or detective was always monitoring Ross throughout his stay at Denver Health; and Ross was discharged from Denver Health into the custody of the Arvada Police Department. In our view, Ross was “in custody” under section 16-3-401(2) and section 16-1-104(9) from the time the police significantly restrained his freedom to move about the house, and he was unquestionably in custody when he was taken to Denver Health and given medical treatment there. We, therefore, agree with the district court that Colorado law requires Arvada to pay the remaining balance of Ross’ hospital expenses.
 ¶36        We also reject the argument of Arvada and CIRSA that there is a lack of clear expression of legislative intent under section 16-3­401(2) to impose civil liability upon governmental agencies for payment of medical care, and that, under Board of County Commissioners v. Moreland, 764 P.2d 812, 817-18 (Colo. 1988), section 16-3-401(2) does not create a private right of action for medical providers. In Moreland, the court determined that before a private civil liability remedy will be recognized for injuries resulting from a breach of obligations legislatively imposed on a governmental entity and unknown at common law, a clear expression of legislative intent must be found. 764 P.2d at 817-18. However, this exact argument was addressed and rejected in Poudre Valley, 85 P.3d at 561, where the division reasoned that Moreland involved an action arising from a governmental agency breaching statutory obligations. Here, Arvada did not breach its statutory obligations; rather, the hospital helped Arvada fulfill its statutory obligations by providing medical treatment to a person in Arvada’s custody. Denver Health is therefore entitled to payment for its services. See Poudre Valley, 85 P.3d at 561. Thus, Moreland and other cases discussing private rights of action “based on violations of statutory duty are simply inapposite in our view.” Poudre Valley, 85 P.3d at 561.
 IV. CGIA
 ¶37        Arvada contends the district court erred in ruling that Denver Health’s implied contract claim was not barred by the CGIA. Arvada contends Denver Health’s implied contract claim is barred by the CGIA because it could lie in tort.[6] We disagree. A. Standard of Review and Applicable Law
 ¶38        Determining whether there is immunity under the CGIA is a question of subject matter jurisdiction to be decided pursuant to C.R.C.P. 12(b)(1). Moran v. Standard Ins. Co., 187 P.3d 1162, 1164 (Colo. App. 2008). We review a district court’s interpretation of the CGIA de novo. Id. at 1164-65.
 ¶39The CGIA establishes immunity from tort actions for public entities and for public employees acting within the course and scope of their employment. Id. at 1164. The CGIA, however, is not intended to apply to “actions grounded in contract.” Patzer v. City of Loveland, 80 P.3d 908, 910 (Colo. App. 2003).
 ¶40        Section 24-10-106(1), C.R.S. 2015, of the CGIA states: “A public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by the claimant . . . . ” The form of a complaint “is not determinative of whether the claim is based in tort or contract. Rather, the dispositive question is whether the claim is a tort claim or could be a tort claim for purposes of the [C]GIA.” Patzer, 80 P.3d at 910.
 ¶41        To determine whether a particular claim is one that “lies in tort or could lie in tort for purposes of the CGIA, a court must consider the nature of the injury and the relief sought. This determination must be made on a case-by-case basis.” CAMAS Colo., Inc. v. Bd. of Cty. Comm’rs, 36 P.3d 135, 138 (Colo. App. 2001). A court should also examine whether the claim and the duty that was allegedly breached “arise from the terms of [a] contract itself.” Id. Additionally, because “governmental immunity is in derogation of Colorado’s common law, the grant of immunity is to be strictly construed, and a waiver of that immunity is to be liberally or deferentially construed.” Id.
 B. Analysis
 ¶42        The district court rejected Arvada’s argument that Denver Health’s implied contract claim was barred by the CGIA. We discern no error in the court’s ruling.
 ¶43        To begin, whether Denver Health’s claim was based on an implied, rather than an express, contract does not matter. An implied contract is quasi-contractual, and courts may “allow recovery to serve the ‘law of natural immutable justice and equity.’” Interbank Invs., LLC v. Eagle River Water & Sanitation Dist., 77 P.3d 814, 816 (Colo. App. 2003) (quoting DCB Constr. Co. v. Central City Dev. Co., 965 P.2d 115, 119 (Colo. 1998)). Where a court “finds a duty which justifies its imputation of a promise to perform, an implied contract may be found and recovery upon quantum meruit may be had.” Schuck Corp. v. Sorkowitz, 686 P.2d 1366, 1368 (Colo. App. 1984). Claims based on an implied contract, or claims for quantum meruit, have been found to be contractual and, therefore, not barred by the CGIA. See CAMAS, 36 P.3d at 139.
 ¶44        Additionally, the nature of Denver Health’s injury and the relief Denver Health seeks are both based solely in contract. See id. at 138. Denver Health does not allege any tortious conduct by Arvada, nor does it seek any tort remedies. Instead, Denver Health alleges that it provided medical treatment to Ross with a reasonable expectation of payment for the value of the treatment it provided, and that Arvada has been unjustly enriched by its failure to reimburse or pay Denver Health for the medical treatment it provided. Therefore, Denver Health’s injury is founded on the implied contract between Arvada and itself, not on any tortious conduct by Arvada. Furthermore, Denver Health only seeks payment for the medical services it provided to Ross while he was in Arvada’s custody and does not seek any damages sustained outside its implied contract with Arvada. See id. We, therefore, conclude that Denver Health’s implied contract claim does not, and could not, lie in tort, and thus we conclude that Denver Health’s implied contract claim is not barred by the CGIA. See id. at 139.
 ¶45        Arvada also argues that the district court never made a finding that Denver Health’s claim could not lie in tort. See id. at 138. The record belies this argument. Although the district court did not expressly make such a finding in its summary judgment order, the court did address the nature of the alleged injury and relief sought in its previous order denying Arvada’s motion to dismiss based on immunity under the CGIA. There, the district court expressly ruled that Denver Health’s implied contract claim was quasi-contractual, “sounds in contract,” and did not and could not lie in tort. Thus, the court’s conclusion in its summary judgment order that Denver Health’s implied contract claim was not barred by the CGIA clearly included and implied its previous determination that the claim could not lie in tort.
 ¶46        Nor are we persuaded by Arvada’s reliance on Patzer, 80 P.3d at 910, as being analogous here. In Patzer, the plaintiffs argued that they had built a residence in accordance with a building permit issued by the City of Loveland, and, thus, the City was contractually obligated to issue a certificate of occupancy. Id. at 911. A division of this court, however, held that because building permits are licenses, and licenses do not create contracts, issuing a building permit did not support a contractual obligation or promise by the City to issue a certificate of occupancy; therefore, the plaintiffs’ claims were barred by the CGIA. Id. at 910-12. Patzer is distinguishable and inapplicable here. The division’s holding in Patzer was based on the fact that building permits are licenses that do not create a contract, and on the fact that the plaintiffs’ claims sounded in tortious negligent misrepresentation. Id. at 911-12. In this case, there are no licenses, and Denver Health’s claim does not and could not allege any tortious conduct.
 ¶47        We also reject Arvada’s argument that the handwritten notes by one of its officers on a hospital form stating that “suspect is responsible- he shot self” was sufficient to release Arvada from liability for Ross’ medical expenses. Rather, we agree with Denver Health that the officer’s signature and writing on this form are irrelevant because the officer could not release Arvada from its statutory obligations under section 16-3-401(2), nor did the officer’s notes on the form have any effect on the alleged implied contract between Arvada and Denver Health.
 ¶48        Accordingly, we agree with the district court that Denver Health’s implied contract claim was not barred by the CGIA.
 V. Conclusion
 ¶49        The judgment is affirmed.

  
 [1] As discussed below, the division in Poudre Valley Health Care Inc. v. City of Loveland, 85 P.3d 558, 560 (Colo. App. 2003), held that because section 16-3-401(2), C.R.S. 2015, unambiguously imposes a duty on governmental entities to provide medical treatment and care for detainees in their custody, such a duty includes or, at a minimum, implies an inherent obligation to pay the costs of such treatment and care.
 [2] On appeal, the Colorado Intergovernmental Risk Sharing Agency (CIRSA) filed an amicus curiae brief in support of Arvada, and the Colorado Hospital Association and the City and County of Denver filed amicus curiae briefs in support of Denver Health.
 [3] Pursuant to section 17-26-104.5(1), C.R.S. 2015, a “county jail may assess a medical treatment charge against any person who receives while being held in custody medical treatment performed by a physician, dentist, nurse, or licensed hospital or as a result of a sick call or for whom a prescription is filled.” That section is not relevant here because Ross was not held in a county jail.
 [4] We note that the district court’s order did not characterize Poudre Valley as being “dispositive,” but rather it referred to that case as being “on point” and “analogous to the facts” in this case.
 [5] See Hosp. Bd. of Dirs. v. Durkis, 426 So. 2d 50, 51 (Fla. Dist. Ct. App. 1982); United Hosp. v. D’Annunzio, 514 N.W.2d 681, 684 (N.D. 1994); see also Health & Hosp. Corp. of Marion City, 470 N.E.2d 1348, 1359 (Ind. Ct. App. 1984) (“[L]ogic dictates that the Sheriff’s duty to care for his prisoners includes the duty to pay for medical treatment.”); Dodge City Med. Ctr. v. Bd. of Cty. Comm’rs, 634 P.2d 163, 165 (Kan. Ct. App. 1981) (Counties liable for medical care of their prisoners have the same obligation to anyone in custody); Lutheran Med. Ctr. v. City of Omaha, 429 N.W.2d 347, 352 (Neb. 1988) (Cities have a “common-law liability to pay for medical treatment required by a person in police custody, such as a suspect wounded by police in the process of apprehending the suspect and such other persons needing necessary medical care while in custody.”).
 [6] Arvada also argues that Denver Health’s unjust enrichment claim could lie in tort. However, Denver Health never alleged a separate claim of unjust enrichment. Instead, Denver Health alleged, as part of its implied contract claim, that Arvada has been unjustly enriched by its failure to reimburse or pay Denver Health for medical treatment it provided to Ross.
  
 JUDGE MÁRQUEZ concurs.
 JUDGE VOGT specially concurs.
 JUDGE VOGT, specially concurring.
 ¶50I concur fully in the analysis and the result in the majority opinion. I write separately to highlight issues raised in this case that, in my view, cry out for resolution by the General Assembly.
 ¶51      As explained in the majority opinion, the constitutional requirement that governmental entities provide medical care to persons in their custody, codified in Colorado in section 16-3­401(2), C.R.S. 2015, includes an inherent obligation to pay for the costs of such care. I agree that the statutory definition of “custody” in section 16-1-104(9), C.R.S. 2015 (“the restraint of a person’s freedom in any significant way”), applies to section 16-3-401(2) and, under the facts of this case, unambiguously requires that Arvada reimburse Denver Health for Terry Ross’s medical expenses.
 ¶52While I believe the holding here gives effect to the plain language of the statutes, I also recognize that sections 16-3-401(2) and 16-1-104(9) as currently written can subject municipalities to potentially significant medical costs in a variety of situations. Arvada states that under the statutory definition of custody, its police department could be financially responsible for medical costs where, for example, officers restrain an intoxicated and injured teenager until an ambulance arrives; or where they come upon injured individuals following a shootout between rival gangs and do not allow the individuals to leave the scene until they can be transported to a hospital; or where a police officer shoots a suspect in self-defense; or where the police arrive on the scene of a domestic violence incident, take both individuals into custody, and both require medical attention. As Arvada correctly notes, even if the section 16-1-104(9) definition of custody applies to section 16-3­401(2), the statutes are silent as to the point in time at which custody is determined and as to whether it matters who caused the need for medical assistance.
 ¶53Given these uncertainties, Arvada argues, the current statutory scheme has a potentially chilling effect on law enforcement’s willingness to be the first on the scene in response to a situation that might involve injured individuals.
 ¶54Denver Health responds that there is no proof that the “chilling effect” Arvada describes has been felt over the life of section 16-3-401(2) or since Poudre Valley Health Care Inc. v. City of Loveland, 85 P.3d 558 (Colo. App. 2003), was decided. That may be correct. However, more concrete examples of the reach of the statute are cited by CIRSA, appearing as amicus on behalf of its numerous member municipalities:
 Denver Health has in the past sought reimbursement from CIRSA members for injuries such as dog bites occurring during the apprehension of a fleeing suspect, self-inflicted injuries occurring during a drunk driving episode before police even arrived, gunshot wounds sustained when a suspect ran at officers with a knife, among many other circumstances. These cases have ranged from the relatively insignificant (thousands of dollars) to the immense (half a million dollars). Additionally, time, effort, and resources of the members’ personnel is required to review, research, and determine the merit of claims submitted. The diversion of these resources has impacted the ability of CIRSA members to effectively budget for and fund other valuable and necessary public projects.
 ¶55CIRSA states that the current statutory scheme, as interpreted by the courts, has caused “ongoing uncertainty” for its members, and that “[i]f courts continue to determine that municipalities are responsible for paying the medical treatment of every suspect they arrest – regardless of whether the injury was self-inflicted or pre­existing, and with no limit whatsoever on liability – all manner of government services will come under increased strain.”
 ¶56In my view, these are valid concerns. However, relieving municipalities from responsibility for medical expenses raises equally legitimate concerns. As Denver Health explains, “[t]hese are zero sum circumstances where the interests of the parties are inversely related . . . . Either the medical provider or [the] governmental agency must incur the costs of care if there are no other payors.” Citing Colorado’s “public policy favoring hospitals’ right to be paid for their life-saving work,” Amicus Colorado Hospital Association points out that hospitals, like municipalities, have operating budgets that are heavily impacted when they have to absorb large unreimbursed expenses, and that smaller rural hospitals in particular can be adversely affected when confronted with large costs of uncompensated emergency treatment.
 ¶57Amicus curiae City and County of Denver brings another perspective to the discussion. According to Denver’s brief, it “has contracted to pay more than $5,000,000 to Denver Health for care of persons Denver takes into custody and brings to Denver Health for treatment in 2015.” These funds are provided by Denver taxpayers. Thus, “any failure by a jurisdiction to pay for the medical care of its own detainees has the net effect of transferring at least a portion of the fiscal burden from taxpayers in that jurisdiction to the taxpayers of Denver.” This result, Denver argues, is not sound public policy, is unfair to Denver taxpayers, and was not the legislature’s intent.
 ¶58These are difficult issues, with compelling arguments on both sides. Resolution of the issues, in my view, is a quintessentially legislative function. The General Assembly can receive input from all parties that have a stake in the issue, can discuss and debate the competing policies, and can then enact legislation that will take into account the interests of all parties while protecting the rights of persons in the custody of the government to receive necessary medical care. I urge it to do so.
 
These opinions are not final. They may be modified, changed or withdrawn in accordance with Rules 40 and 49 of the Colorado Appellate Rules. Changes to or modifications of these opinions resulting from any action taken by the Court of Appeals or the Supreme Court are not incorporated here.